HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MASTERS SOFTWARE, INC.,

        Plaintiff,

    v.

DISCOVERY COMMUNICATIONS,
INC., et al.,

        Defendants.

CASE NO. C10-405RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on the motion (Dkt. # 6) of Plaintiff Masters Software, Inc. ("Masters") for a preliminary injunction, and a motion (Dkt. # 26) to seal certain documents Defendants filed in opposing Masters' motion.  No party requested oral argument.  For the reasons stated below, the court GRANTS Masters' motion for a preliminary injunction, and DENIES Defendants' motion to seal.

Because this order "grant[s] or den[ies] an interlocutory injunction," findings and fact and conclusions of law are required.  Fed. R. Civ. P. 52(a)(2).  The court's findings and conclusions are included in this order, which serves as a memorandum of the court's decision.  Fed. R. Civ. P. 52(a)(1) (permitting findings and conclusions to be contained within "an opinion or a memorandum of decision filed by the court"); *see also FTC v. H.*

ORDER – 1

*N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982) (noting that explicit factual findings are unnecessary).

## II.  BACKGROUND

Kelley Masters, once a professional cake decorator, decided in 2006 to begin her own business.  Building on her prior experience, she and her husband Jon Masters, co-owners of Masters, developed software to assist professional cake bakers with business management, including cost tracking, recipe organization, calendaring, and invoicing customers.  She named the software "CakeBoss," and began selling it in 2007.  Under various licensing regimes, the software has sold for between $60 and $149.  She prepared her product launch in advance, registering the internet domain name www.CakeBoss.com (the "CakeBoss website") in February 2006.  The website serves not only as a retail site for CakeBoss software, but a forum for the distribution of other information, including CakeBoss-branded cake recipes and CakeBoss-branded cake baking tutorials.

In advertising in baking-related periodicals, baking-related websites, and trade shows, Masters uses the term "CakeBoss" in white letters with a stylized logo of a faceless icon in a baker's hat to the left of the "C".  In a few instances, it places the words "Cake" and "Boss" atop each other in white letters with a larger version of the baker icon to the left.

In March 2009, Ms. Masters discovered that The Learning Channel, a cable television network owned and operated by the three corporate Defendants (collectively "Discovery") was planning to introduce a new television show called "*Cake Boss*."  *Cake Boss* was to be a "reality" program featuring professional baker Bartolo "Buddy" Valastro, who owns Carlo's Bakery in New Jersey, and his employees, many of whom are members of his family.  Ms. Masters learned that *Cake Boss* was set to premiere on April 19, 2009.

Ms. Masters traced the corporate hierarchy of The Learning Channel and called the legal department of parent company Discovery Communications, Inc., beginning on

ORDER – 2

1
2
3
4
5

March 25, 2009, the same day Discovery announced *Cake Boss* to the public.  After

Kelley Masters left voicemails, Jon Masters received a call from a Discovery

representative on March 27.  He informed Mr. Masters that Discovery did not believe that

a television show named *Cake Boss* could be confused with a software product of the

same name.  Discovery declined to change the name of the show.

6
7
8
9
10
11
12
13
14

Ms. Masters tried another tack, sending a baker-to-baker email to Mr. Valastro

himself on March 30, 2009.  She explained that Masters was "very concerned that the

name of your new show is going to cause significant dilution of our brand name and

identity that we have worked so hard for two years to build."  She concluded with a

request "from one caker to another": "I love your cakes and my wish for you is that your

show is a huge success.  I only wish it didn't have the same name as my product."  On

March 30, 2009, Mr. Valastro telephoned Ms. Masters.  He expressed sympathy for the

situation, and stated that he would speak to the show's producers to see if anything could

be done.

15
16
17
18
19
20
21
22
23

There is no evidence that Discovery tried to determine if "Cake Boss" was in use

in business before it chose the name in February 2009.  The website at

www.cakeboss.com was online at that time, so even a rudimentary search would have

revealed Masters' use of the term.  Discovery denies that it was aware of Masters or

CakeBoss when it named the show, so it is unlikely that Discovery conducted even a

rudimentary search for existing uses of the name.  Discovery either knew or easily could

have known about Masters when it chose the name *Cake Boss*, and certainly knew about

Masters from Ms. Masters' phone calls no later than March 25, 2009, the day it

announced *Cake Boss* to the public.

24
25
26
27

Discovery plunged ahead with *Cake Boss*.  The show premiered on April 19, 2009,

and has now completed two seasons of thirteen and seventeen half-hour episodes,

respectively.  Including repeats, The Learning Channel has shown episodes from the first

28

ORDER – 3

two seasons almost 600 times.  First airings of the episodes have averaged millions[1] of viewers.  The third season is underway.  Each episode centers around one or more challenging cakes that Mr. Valastro and the Carlo's Bakery staff must make for a customer.  The show has been a success for Discovery, both in terms of attracting viewers (and thus advertising dollars) and in terms of building the goodwill of The Learning Channel.  That success has a price; Discovery has provided evidence that it has invested millions of dollars[2] in developing, producing, and promoting *Cake Boss*.

Discovery and Mr. Valastro have their expanded their *Cake Boss* brand from a television show to related merchandising.  Discovery sells *Cake Boss*-branded T-shirts, chef's jackets, drink mugs, and DVDs of the first two seasons of the show.  Mr. Valastro is the author of a forthcoming book "Cake Boss:  The Stories and Recipes from Mia Famiglia."  In the show itself and in related products, Discovery uses a logo consisting of the word "Cake" in scrolling capital letters with the word "Boss" imposed below it diagonally in heavy block type.

The coexistence of *Cake Boss* and CakeBoss has not been entirely peaceful.  Masters has received dozens of email and handwritten communications evidencing confusion between the two marks.  The court will address those communications in detail in its later analysis.  For now, it suffices to remark that those communications consist of everything from misdirected fan mail to requests for custom cakes to inquiries about the relationship between the CakeBoss website and the show.  Masters' "CakeBoss" page on the Facebook social networking site has many followers who believe that CakeBoss and *Cake Boss* are related.  Users in online cake-related forums have attributed Masters'

---

[1] In its motion to seal, Discovery argues that both the ratings for *Cake Boss* and the dollar amount of its investment in the show are confidential, and should not be disclosed to the public.  Indeed, in its opposition to Masters' injunction motion, Discovery repeatedly redacts even the admission that it has spent "millions of dollars" on *Cake Boss*.  The court finds no need to hide from the public that millions of people watch *Cake Boss*, a television show in which Discovery has invested millions.

[2] The court finds no basis for concealing from public view a rough estimate of Discovery's investment in *Cake Boss*.  *See supra* n.1.

ORDER – 4

CakeBoss-branded recipes from its website to Mr. Valastro and *Cake Boss*.  The CakeBoss website is often overwhelmed with visitors coinciding with the airing of a *Cake Boss* episode, and has at times shut down in response to the excessive traffic.  At a February 2010 trade show, a cake supplier approached Ms. Masters and expressed his belief that CakeBoss software was associated with *Cake Boss*.

As *Cake Boss* began to overwhelm the CakeBoss brand, Masters in late 2009 entered an agreement with a supplier to sell CakeBoss-branded cake decorating products. The first item offered was a cake decorating kit.  Less than a month after sales began, Mr. Valastro contacted the supplier and stated that if it did not cease the sale of CakeBoss-branded products, Discovery would take legal action.  The supplier decided to stop selling the kits, citing both a desire to avoid a legal battle with Discovery and the fact that there had been only a few sales.

Masters filed this suit in March 2010, and filed its motion for a preliminary injunction on April 29.  Masters seeks an injunction against Defendants' use of the term "Cake Boss," whether in connection with the name of the television show or in related commercial activity.

### III.  ANALYSIS

Both parties rely on a Ninth Circuit standard for preliminary injunctive relief that the Supreme Court rejected in *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374-75 (2008).  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter*], they are no longer controlling, or even viable.") (quoting *Am. Trucking Assns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). The *Winter* standard requires the party seeking a preliminary injunction to "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  129 S.Ct. at 374.

ORDER – 5

1

2

**A.      Masters Is Likely to Succeed on the Merits of Its Reverse Confusion Trademark Infringement Claim.**

3

4

Although Masters raises a variety of claims in its complaint, its request for an injunction is based solely on its claim for trademark infringement in violation of the Lanham Act.  The Lanham Act prohibits the "use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods."  15 U.S.C. § 1125(a)(1)(A).  In any trademark case, likelihood of confusion is the touchstone.  In the typical case, the first user of a mark (the senior user), sues a later user of a confusingly similar mark (the junior user), alleging that the junior user is attempting to capitalize on the confusion created by the marks to take a free ride on the senior mark's goodwill.  In a "reverse confusion" case like this one, the senior mark seeks to "protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity."  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002).  Here, there is no question that because of widespread media exposure and Discovery's comparatively massive marketing campaign, *Cake Boss* is much better known than CakeBoss, even though Discovery is the junior user of the mark.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

In a reverse confusion case, a senior user of a mark cannot merely point to the success of a junior user; likelihood of confusion remains the key.  The question is whether consumers are likely to mistakenly believe that Masters' CakeBoss products are "somehow affiliated with or sponsored by" *Cake Boss*.  *Cohn*, 281 F.3d at 841; *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) ("The question . . . is whether consumers doing business with the senior user might mistakenly believe they are dealing with the junior user.").

21

22

23

24

25

26

27

28

ORDER – 6

In answering this question, the court takes guidance from the eight *Sleekcraft* factors, first collected in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). They are:

> (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound, and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion.

*Dreamwerks*, 142 F.3d at 1129. The factors are intended as guideposts only, and the weight to be afforded to each depends on the circumstances of the case. *See id.* ("The factors should not be rigidly weighed; we do not count beans."); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them."). The court now considers each of the *Sleekcraft* factors en route to determining whether Masters is likely to succeed in proving that consumers are likely to be confused by Discovery's use of "Cake Boss."

### 1.    Strength of the Mark

In a reverse confusion case, the court focuses on the strength of the junior mark, although the strength of the senior mark is relevant as well. *Surfvivor*, 406 F.3d at 631 n.3. The inherent strength of a mark is measured along the following spectrum: arbitrary and fanciful marks are the strongest, suggestive marks fall in the middle, descriptive marks are presumptively weak, and generic marks are not entitled to trademark protection at all. *Id.* at 631-32. A mark is arbitrary if it uses known words that have no connection to the product (e.g., "Old Navy" for a clothing store). *Id.* It is fanciful if it consists of a "coined" word or phrase that is not inherently evocative of the product (e.g., "iPod" for a portable music player). *Id.* at 632. Suggestive marks do not describe the product, but suggest its features, requiring some degree of imagination to make the suggestive leap (e.g., "Greyhound" for a bus service). *Id.* Descriptive marks merely describe a feature of the product without engaging the imagination (e.g. "flame broiled" for hamburgers). *Id.*

ORDER – 7

Generic marks do not merely describe a product, but are synonymous with an entire class of products (e.g. "24-Hour News" for an around-the-clock news network).

"Cake Boss," as both Discovery and Masters use the mark, is suggestive. When applied to Masters' software, it suggests the principal feature of the product, management of a bakery business.[3] When applied to Discovery's television show, it suggests Mr. Valastro himself, the boss of a bakery focused on cakes.

Were the court focused solely on Masters' mark, Masters could perhaps not overcome the presumption that a suggestive mark is weak and undeserving of protection. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999); *Dreamwerks*, 142 F.3d 1130 (noting relative weakness of suggestive marks). Masters is a small business, and it does not suggest that its software has become broadly renown. As the court has noted, however, the focus in a reverse confusion case is on the junior mark, and the court cannot disregard the massive marketing muscle Discovery flexes in ensuring that *Cake Boss* leaves an imprint on the consuming public. In determining the strength of a trademark, its "commercial strength" is as relevant as its inherent strength. *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). The greater the power of Discovery in the marketplace, "the more likely it is to capture the minds of [Masters'] customers." *Dreamwerks*, 142 F.3d at 1130 n.5.

There is no question that Discovery's power to market *Cake Boss* overwhelms Masters' power to market CakeBoss. Discovery's junior mark is promoted repeatedly on national television, whereas Masters' senior mark is promoted modestly in specialty periodicals and online. It is highly likely that Discovery's junior mark will "overwhelm any public recognition and goodwill that [Masters] has developed in the mark." *Cohn*,

---

[3] For the record, the court notes that Masters obtained a federal registration for the CakeBoss trademark on February 9, 2010. The federal registration certificate covers bakery management software, online cake baking instruction, and other online baking information. There is no evidence that Discovery has registered or attempted to register any trademark in connection with *Cake Boss*. Section 43 of the Lanham Act (15 U.S.C. § 1125), the provision that Masters invokes in this motion, applies equally to registered and unregistered trademarks. *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 n.3 (9th Cir. 2000).

ORDER – 8

281 F.3d at 841.  There is a substantial danger that Discovery's "ability to saturate the marketplace" will lead consumers to assume that CakeBoss is somehow associated with *Cake Boss*.  *Id.* at 842.

        **2.**        **Evidence of Actual Confusion**

        The court need not simply hypothesize that the marketing resources behind *Cake Boss* threaten to overwhelm whatever goodwill CakeBoss has built; there is evidence that this has happened already.  The record reveals that Masters has received dozens of misdirected communications from fans of *Cake Boss*.  By itself, this might simply indicate that casual fans are too quick to assume that any email sent to the CakeBoss.com domain will reach representatives of *Cake Boss*.  A review of the misdirected emails, however, shows much more: people are visiting the CakeBoss website, assuming that it is connected to the television show even though the website promotes Masters' software and makes no reference to the television show, and using email addresses provided on the CakeBoss website in an attempt to contact *Cake Boss*.  Most of the emails are addressed to Ms. Masters (Kelley@CakeBoss.com) or to her husband, (Jon@CakeBoss.com).[4] Some of the emails explicitly inquire whether CakeBoss is associated with *Cake Boss*. Many of them request custom cakes from Mr. Valastro, and in at least one of them, the writer expresses disappointment because no one has responded to her requests.  One writer wrote to Mr. Masters to complain that the bakers on *Cake Boss* should be washing their hands and wearing gloves and hair nets.  In one email, the writer relays that she baked a cake using a recipe from the CakeBoss website, but attributed the recipe to Mr. Valastro and *Cake Boss*.  The same mistake has been repeated in other online cake-baking forums: consumers pass along CakeBoss-branded recipes or tutorials while attributing them to *Cake Boss*.

---

[4] To be sure, some of the emails are simply misaddressed.  Email sent to buddy@cakeboss.com, for example, is unlikely to have originated from someone viewing the CakeBoss website.

ORDER – 9

These communications are powerful evidence that *Cake Boss* casts so long a shadow in the cake baking market that some consumers cannot view the CakeBoss website or its contents without believing it is associated with the show. Although the website itself is connected to the show only by its name and its focus on cake baking, many consumers are unable to come to any conclusion except that CakeBoss is connected with *CakeBoss*.

Confusion between these marks is not limited to casual fans. People in the baking business have assumed that CakeBoss is related to *Cake Boss*, as evidenced by Masters' experiences at trade shows. Discovery and Mr. Valastro point out that they receive many more communications than Masters from people who do not appear to be confused, but this is to be expected. Most people are unaware of CakeBoss, including most people who are fans of *Cake Boss*. Among those that are aware or have encountered both marks, however, there is substantial evidence of actual confusion.

Discovery discounts this evidence of confusion, contending that Masters has failed to prove that anyone purchasing or intending to purchase its software has been confused, as opposed to confusion among non-purchasing consumers. Discovery's view of relevant confusion is too narrow. While Masters' case would perhaps be even stronger if it offered evidence that software purchasers perceive a link between the software and the television show, the confusion it has shown is highly relevant to its ability to control its brand. Visitors to its website need not purchase its software to be of commercial value to Masters. People who merely view the website can pass on information about it to those who might be interested in buying software. People who download or copy CakeBoss-branded recipes or cake-baking tutorials from the website spread word of the brand. Masters' evidence shows that many CakeBoss web site visitors assume that the brand is Discovery's, not Masters'. The court finds Masters' evidence of actual confusion highly probative of the very harm that a reverse confusion case is designed to remedy: loss of control over the senior user's brand.

ORDER – 10

Putting aside the evidence of actual confusion, the court notes that confusion is to be expected when one's trademark is already in use as the address of another's website. In a recent opinion, a Ninth Circuit panel commented on "trademark.com" websites, noting that "the case where the URL consists of nothing but a trademark followed by a suffix like .com or .org is a special one indeed." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, No. 07-55344, 2010 U.S. App. LEXIS 13930, at *9-13 (9th Cir. Jul. 8, 2010).  A domain name consisting "*only* of the trademark followed by .com . . . will typically suggest sponsorship or endorsement by the trademark holder." *Id.* at *9-10 (emphasis in original). *Toyota* was concerned with forward confusion, but the reasoning is just as apt in a reverse confusion case like this one.  The superior marketing behind the *Cake Boss* trademark means that users are apt to associate CakeBoss.com with the television show. Masters' evidence demonstrates as much.

### 3.    Similarity of Sight, Sound, and Meaning

In determining whether marks are similar enough to confuse consumers, the court must consider their sight, sound, and meaning as they appear in the marketplace. *Goto.com*, 202 F.3d at 1206.  CakeBoss and *Cake Boss* are aurally indistinguishable. Visually, the marks employ distinctive fonts, color schemes, and graphics.  The CakeBoss trademark sometimes appears with the phrase "Software for Bakers" or "Essential software for your cake business," whereas the *Cake Boss* logo sometimes appears with The Learning Channel's trademark.  The evidence suggests, however, that the visual distinctions between the marks mean little to consumers.  Neither Masters nor Discovery has offered evidence that consumers have strong associations with their marks as they appear visually.  The number of consumers who associate the CakeBoss website with *Cake Boss*, even though nothing resembling the *Cake Boss* logo appears on the site, suggests that the visual dissimilarities between the marks are insufficient to dispel confusion.  Instead, the evidence suggests that Discovery's marketing power has led consumers to associate any use of the words "cake boss" with its television show.

ORDER – 11

1          **4.      Proximity or Relatedness of the Goods**

2          Masters' primary product, CakeBoss software, is not at first glance closely related

3     either to the *Cake Boss* television show or any related merchandise.  Ordinarily, the court

4     would expect that software and a television show with its souvenirs could safely be sold

5     in the marketplace under similar marks without any likelihood of confusion.  In this case,

6     that expectation is attenuated because an audience to which both Masters' and Discovery

7     cater, persons interested in cake baking, is a relatively small market niche.  It can be

8     expected that any person who might consider purchasing CakeBoss software likely

9     knows about *Cake Boss*, and indeed the record contains online communications from

10    persons who knew about CakeBoss before *Cake Boss* premiered, and commented on

11    both.  In this niche market, cake-bakery-management software and a show about the

12    adventures of Mr. Valastro and his cake bakery staff has a reasonable likelihood of being

13    associated with *Cake Boss*.  Moreover, it bears noting that Masters' software is designed

14    for cake bakeries like Mr. Valastro's.  It is thus not a substantial leap for a consumer

15    encountering CakeBoss software in the market place to imagine that *Cake Boss* might

16    have an interest in selling or sponsoring cake bakery management software.

17         The court also notes that while Masters currently sells only software, it distributes

18    other "products" in its marketing efforts.  The CakeBoss website offers free cake baking

19    tutorials and recipes.  Any consumer might associate those products with *Cake Boss*, and

20    indeed, the evidence shows that consumers have assumed that CakeBoss recipes and

21    tutorials originate with or are sponsored by *Cake Boss*.  That Masters does not charge

22    money for these products is hardly relevant.  Masters provides these items for the same

23    reason that any trademark holder provides branded freebies: it hopes to build the

24    goodwill of its brand.

25         Shifting the focus from the realities of the market in which Masters' operates,

26    Discovery points to several cases in which senior owners of trademarks have failed in

27    their efforts to establish reverse confusion arising from a junior use of the mark as a title

28    ORDER – 12

for a television show.  Contrary to Discovery's implicit contention, there is no "television shows always win" rule in the Ninth Circuit, as an examination of the cases reveals.

In *Surfvivor*, a senior owner of a trademark for surfing gear sued junior users associated with the "*Survivor*" television program.  The senior user sold, among other things, t-shirts, sunscreen, and lip balm under the "Surfvivor" mark; whereas the junior user sold the same items under the "Survivor" mark.  *Surfvivor*, 406 F.3d at 629.  The court found scant evidence of actual confusion, and noted that there was no indication that consumers would confuse the products at issue.  *Id.* at 633.  The court has no evidence bearing on this question, but it hazards the guess that the target audience for shorts and lip balm is far larger than the target audience for cake bakery software.  *Survivor*'s marketing shadow may not have been broad enough to darken the entire market for sunware.  The court finds otherwise with respect to *Cake Boss*'s influence over the narrower market at issue in this case.

In *Playmakers LLC v. ESPN, Inc.*, a senior user of the "Playmakers" mark for a sports agency sued the producer of a television show called *Playmakers*.  376 F.3d 894, 895-96 (9th Cir. 2004).  The agency had no product other than its agency services.  *Id.*  The television show was a "behind-the-scenes view of a fictional professional football team."  *Id.* at 896.  In the wide world of sports, agents for athletes are easily distinguished from football teams.  The world of cake bakery is, as the record reflects, not so wide.  There is, moreover, no obvious reason to associate a sports agency with a show about an imaginary football team.[5]  In this case, as the court has noted, there is a much easier-to-envision association between the producers of bakery software and the producers of a show about a bakery.  This is especially so where both Masters and Discovery show an interest in protecting related turf – sales of cake bakeware.

---

[5] In the district court ruling that the *Playmakers* court upheld, the court noted that there was no evidence of actual confusion.  297 F. Supp. 2d 1277, 1283 (W.D. Wash. 2003).

1   In *Murray v. Cable Nat'l Broad. Co.*, the court found no possibility of reverse

2   confusion between a cable network called "America's Talking" and a consumer survey

3   firm using the mark "America Speaks."  86 F.3d 858, 861 (9th Cir. 1996).  In addition to

4   the facial differences between the marks, the court noted that there was no evidence of

5   market saturation with respect to polling activity, no evidence that the parties shared any

6   customers or potential customers, and no evidence of actual confusion.  *Id.*

7   Finally, in *Monster Cable Prods., Inc. v. Discovery Communications, Inc.*[6],

8   Discovery itself successfully fought off a reverse confusion claim from the makers of

9   "Monster" audio and video equipment challenging Discovery's use of the title "Monster

10  Garage" for a television show about a garage where mechanics transform ordinary

11  vehicles into unique (and perhaps monstrous) vehicles.  Again, the difference between

12  audio and video equipment and a television show about specially modified cars is, to say

13  the least, much starker than the difference between a television show about a cake bakery

14  and cake bakery management software.  Moreover, while the *Monster* court dismissed

15  claims of confusion between Monster products and the show itself, it declined to dismiss

16  claims of confusion between Monster's CDs, clothing, and automotive products and

17  similar *Monster Garage*-branded products.

18  **5.     Type of Goods and Purchaser Care**

19  The courts' discussion of previous factors largely subsumes a discussion of the

20  types of goods the parties sell.  Software and television shows are distinct goods, but in

21  this case, consumers within the narrow market niche at issue confuse the origin of those

22  goods nonetheless.  Given the notoriety of *Cake Boss*, consumers are likely to associate

23  virtually any product Masters might offer with the television show, which is a problem

24  not only because consumers attribute Masters' current goods to Discovery, because both

25

26  _____

[6] *Monster Cable* is neither formally published nor available on the LEXIS or Westlaw databases.
27  Discovery attached the order to its opposition brief.  Dkt. # 21-2.  The Honorable William H.
Alsup of the Northern District of California issued the order in 2004.

28  ORDER – 14

1    Masters and Discovery have shown an intent to offer even more similar goods (cake

2    bakeware) within that market in the future.

3          Although there is little evidence as to the degree of care exhibited by purchasers of

4    Masters' software, the court would expect purchasers to be somewhat careful when

5    purchasing a specialty product costing as much as $149.  This weighs in Discovery's

6    favor.  As to Masters' recipes and baking tutorials, however, the court would expect no

7    more care in the selection of those goods than in the selection of any information that is

8    available freely on the internet.

9          **6.      Likelihood of Expansion**

10         Discovery has no intent to sell bakery management software; Masters has no intent

11   to produce a television show.  The parties' core products have little overlap now, and it

12   appears they will have little overlap in the future.

13         Masters has, however, attempted to expand its CakeBoss product line, only to

14   meet with stiff resistance from Discovery.  Defendants' conduct in squelching Masters'

15   effort to market CakeBoss-branded cake bakeware is inconsistent with their contention

16   that there is no likelihood of confusion between the marks.  For CakeBoss and *CakeBoss*,

17   however, it takes only a small hop for each to land in a marketplace in which Defendants

18   apparently concede that confusion is likely.  Mr. Valastro acted quickly to put an end to

19   Masters' attempt to sell cake bakeware, and although there is no evidence that Discovery

20   was directly involved in his effort, Discovery's conspicuous silence suggests that it

21   agrees with Mr. Valastro's contention that the cake bakeware market is not big enough

22   for both *Cake Boss* and CakeBoss.

23         When Masters decided to attempt to sell CakeBoss-branded bakery kits, it was

24   unquestionably attempting to cash in on the fame *Cake Boss* had created.  Discovery

25   suggests that this shows that Masters acted in bad faith, or with unclean hands.  The court

26   finds otherwise.  Masters, faced with the prospect of having its business overwhelmed by

27   a latecomer using the name of its core product, eventually attempted to rise with the *Cake*

28   ORDER – 15

*Boss* tide rather than drown in it.  This would be trademark infringement if Masters were the junior user of the mark.  Against the senior user of the mark, Discovery is in a poor position to accuse Masters of wrongdoing.

Had *Cake Boss* never entered the marketplace, it is unlikely that Masters would have attempted to sell CakeBoss-branded baking products.  There is no suggestion that such an expansion of Masters' product line would have been profitable.  But as the owner of a senior trademark made much more recognizable by the massive marketing campaign of a deep-pocketed junior mark, it is understandable that Masters might expand its product line.  When it attempted to do so, Discovery's protective response serves as an admission that it believes that confusion is likely.

### 7.   Marketing Channels

It is unlikely that a consumer would ever encounter Masters' current products and Discovery's current products in precisely the same marketing channels, particularly because Masters' has limited marketing resources.  Both Masters and Discovery promote their products on the internet, but as Discovery points out, virtually everyone with a product to sell promotes it on the internet.  This is far from a case, however, in which the mere presence of products on the internet is the sole evidence of overlapping marketing channels.  Masters' "offline" marketing efforts are confined to specialty periodicals and trade shows.  Discovery's marketing of *Cake Boss* permeates virtually every marketing channel, even channels that Discovery has not specifically targeted.  For example, a reader of CakeCentral magazine, one of the periodicals in which Masters advertises CakeBoss, might well assume a connection to *Cake Boss* even if Discovery never advertised in the magazine.  Moreover, the likelihood of market channel overlap will only increase if either Masters or Discovery expand their product lines.

### 8.   Intent

Discovery's disregard of Masters' CakeBoss brand weighs in Masters' favor.  Discovery attempts to paint its intent as innocent, denying that it was aware of CakeBoss

ORDER – 16

when it named *Cake Boss*.  The court accepts that Discovery was unaware of CakeBoss at that time, but this is a far cry from evidence of innocent intent.  As noted, it would have taken only a few moments on the internet for Discovery to discover that the name it was considering for its new show (and a multi-million dollar investment) was in use by Masters.  If it did not know about CakeBoss, it should have.  *See Brookfield*, 174 F.3d at 1059 (noting that "actual or constructive" knowledge of a prior use of a mark is evidence of intent); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (finding that a "reasonable investigation into existing uses of the name" of a product is evidence of innocent intent).  Moreover, Discovery undisputedly knew about Masters' use of the term before it aired the first episode of the television show, because Ms. Masters informed them on the same day Discovery announced *Cake Boss* to the public.  Discovery nonetheless pushed ahead with its use of the title, choosing to build its new television franchise on a name already in use by another player in the same market niche.  If it did not intend to overwhelm the brand identity of CakeBoss, it was at least recklessly indifferent to the possibility.

### 9. **Summary of *Sleekcraft* Analysis**

In the court's view, the most important of the *Sleekcraft* factors in this case are the strength of the marks (particularly the commercial strength of Discovery's mark), the similarities between the marks, and the evidence of actual confusion.  Those factors, as well as the remaining *Sleekcraft* factors, convince the court that Masters is likely to succeed in proving that consumers are likely to assume that Masters' CakeBoss products are associated with or sponsored by *Cake Boss.*

### 10. **Discovery's First Amendment Defense**

Before turning to the remaining factors, the court considers Discovery's contention that its choice of *Cake Boss* as the title of an expressive work is entitled to more protection than the typical use of a trademark.  The best support for this argument in the Ninth Circuit comes from *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901-02

ORDER – 17

1   (9th Cir. 2002).  There, the court found that a song entitled "Barbie Girl" did not infringe

2   on Mattel's famous trademark for its Barbie dolls.  In so doing, the court favorably cited

3   the Second Circuit's opinion in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), in

4   which the court held that "in general the [Lanham] Act should be construed to apply to

5   artistic works only where the public interest in avoiding consumer confusion outweighs

6   the public interest in free expression."  *Mattel*, 296 F.3d at 901 (quoting *Rogers*, 875 F.2d

7   at 999).

8        The common thread in *Rogers*, *Mattel*, and similar cases is a well-known senior

9   user seeking to prevent harm associated with the use of its trademark in the title of an

10  expressive work authored by a junior user who intends an association with the senior

11  user.  In *Rogers*, for example, Ginger Rogers challenged a movie entitled "Ginger and

12  Fred," about two Italian cabaret performers who imitated Ms. Rogers' well-known dance

13  collaboration with Fred Astaire.  The title's allusion to Ms. Rogers and Mr. Astaire was

14  no accident, it was an intentional use of their names to express something about the

15  content of the film.  In *Mattel*, the challenged song mocked "Barbie and the values [the

16  song's authors] claim[ed] she represent[ed]."  296 F.3d at 902.  Again, the use of the term

17  "Barbie" was an intentional reference to Mattel's trademarked product used to express

18  something about the content of the song.  Where the only possible association between

19  the commercial interests protected by the Barbie trademark and the song was the use of

20  the word "Barbie" in the title, the court found no likelihood of confusion as a matter of

21  law.

22       Masters' claim against Discovery does not implicate the First Amendment

23  interests recognized in *Mattel* and *Rogers*.  Discovery did not choose the name of *Cake*

24  *Boss* as an allusion to CakeBoss.  Discovery was expressing nothing more than what any

25  user of a suggestive trademark expresses when branding its product, and the Lanham

26  Act's limitations on such "expressions" do not violate the First Amendment.  *See, e.g.*,

27  *Mattel*, 296 F.3d at 900 (noting that when "limited to [their] core purpose – avoiding

28  ORDER – 18

confusion in the marketplace – a trademark owner's property rights play well with the First Amendment"). Were it otherwise, the use of a trademark in the title of an expressive work would never violate the Lanham Act so long as it had some connection to the work's content. *Rogers* and *Mattel* do not express such a rule, but rather a balancing of expressive interests and trademark interests. Put in the language of the *Rogers* balancing test, the public interest in allowing Masters to avoid the consumer confusion that *Cake Boss* has created outweighs the expressive interests (if any) inherent in Discovery's choice of title.[7]

**B.     Irreparable Harm Is Presumed When Confusion is Likely, and the Evidence Shows the Presumption to Be Warranted in This Case.**

The court may presume irreparable injury where a plaintiff shows a likelihood of success on the merits of its trademark infringement claim. *Brookfield*, 174 F.3d at 1066. In the court's view, the presumption is warranted in this case. Among other things, Discovery contends that there should be no presumption of irreparable harm because Masters cannot prove tangible losses, and indeed, may have benefited from the publicity associated with *Cake Boss*. Discovery misses the point. The harm arising from reverse confusion is not likely to be tangible; it is instead the senior user's loss of "the value of [its] trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987); *Atrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (quoting *Ameritech*). The evidence the court has reviewed demonstrates that Masters has suffered each of these harms, and will continue to do so. In this case, *Cake Boss* appears to have simply overwhelmed CakeBoss. Consumers with no evidence other than the consecutive use of the words "cake" and "boss" assume that Masters' website promoting cake baking software is connected to Discovery's television show.

---

[7] Masters queries whether the *Rogers* balancing test applies in a case like this one, observing that *Rogers* is not mentioned in the numerous Ninth Circuit cases addressing reverse confusion involving the titles of television shows. The court need not decide this question.

ORDER – 19

1    Masters is likely to prove that it has lost control of its product identity, its goodwill, and
2    its ability to move into new markets.

3        That Masters may in some way benefit from the popularity of *Cake Boss* only
4    reinforces its showing of harm.  Presently, it appears that most consumers have a
5    favorable view of Mr. Valastro and his television show.  That could change.  Imagine,
6    hypothetically, that one of Mr. Valastro's cakes made a customer ill.  This would no
7    doubt receive much publicity.  In that case, Masters' forced association with Masters
8    might be like a set of lead galoshes, rather than a hot-air balloon.[8]  But whether *Cake*
9    *Boss* is perceived favorably or with disdain, Masters has no way to stop users from
10   associating its CakeBoss brand with *Cake Boss*.  This is irreparable harm to Masters.

11   **C.    Balance of Equities**

12       Discovery misses the mark when it contends that the balance of equities favors it
13   because it would be exceedingly expensive for it to rebrand its television show, whereas
14   it would be much cheaper for Masters to rebrand its software.  Discovery's comparison of
15   the parties' relative rebranding costs is probably accurate, but if that were sufficient to
16   avoid an injunction, an injunction would never be available in a reverse confusion case.
17   The harm in this case is Masters' loss of control over its trademark.  That is no less a
18   harm to Masters merely because it has invested less in its trademark than Discovery has.

19       The court is also not persuaded by Discovery's contention that Masters acted
20   inequitably either by delaying this lawsuit or by attempting to sell CakeBoss-branded
21   cake decorating kits.  Masters contacted Discovery about the name of *Cake Boss* on the
22   *same day* that Discovery announced its forthcoming television series to the public.
23   Masters attempted to negotiate a solution; Discovery rebuffed it.  Masters did not file this
24   suit until about a year later, but that is not an unreasonable delay.  While another business

---

[8] One need not imagine circumstances in which negative associations with *Cake Boss* become a burden for CakeBoss.  As the court has noted, one email to Ms. Masters chides Mr. Valastro and his associates for not wearing gloves, washing their hands, or wearing hair nets.  Another chides Masters for not responding to repeated requests for Mr. Valastro to bake the writer a cake.

ORDER – 20

1  might have sued sooner, Masters chose to see what effect *Cake Boss* would have on its

2  business before making a substantial investment in pursuing litigation against a well-

3  heeled opponent.  Similarly, as the court has already noted, it does not fault Masters for

4  attempting to "cash in" on the publicity associated with *Cake Boss*.  Again, other

5  businesses might have chosen a different path, but the court does not find it inequitable

6  that Masters attempted to profit from the *Cake Boss* phenomenon rather than risk a

7  substantial amount of money attempting to vindicate its trademark rights in court.

8  **D.   Masters' Injunction Request Does Not Implicate the Public Interest.**

9  A substantial portion of the public enjoys *Cake Boss*, but there is no suggestion

10  that they would enjoy it less were it entitled *Buddy the Baker* or whatever other

11  trademark Discovery might choose.  Discovery's interest, which it makes plain in its

12  motion, is to avoid the expense of rebranding its television show.  That interest is

13  understandable, but it is a decidedly private interest.

14  To the extent that the public has any interest in the outcome of this case, it is in

15  permitting businesses and business owners who have invested in branding their products

16  from losing control over their brands.  In that sense, the public interest favors Masters.

17  *See Brookfield*, 174 F.3d at 1066 (noting "public interest in protecting trademarks

18  generally").

19  ### IV.  PRELIMINARY INJUNCTION

20  Masters requested an injunction barring Defendants from using the term "Cake

21  Boss."  After consideration of the harm to Discovery, the timing of Masters' motion, and

22  other equitable factors, the court imposes a less sweeping injunction.

23  The court orders that, pending trial in this matter, Defendants Discovery

24  Communications, Inc., The Learning Channel, LLC, and Bartolo Valastro shall cease

25  using the name "Cake Boss" to identify the television program currently entitled *Cake

26  Boss*, and in connection with the sales of merchandise related to that television program.

27

28  ORDER – 21

With respect to the sales of related merchandise (except for DVDs of the television program), this injunction shall take effect immediately upon Masters' posting of bond.  Defendants are permitted, however, to sell any pre-existing inventory of such products.

With respect to the television program itself, the injunction shall take effect after Masters posts bond and after Defendants complete all scheduled first-run airings of the third season of *Cake Boss*.  Within one month following the final first-run airing of the third season, Defendants may not use the name "Cake Boss" in connection with either repeat showings of any episode of any season of the television program or with any episodes in future seasons.

This injunction does not apply to Mr. Valastro's forthcoming book "Cake Boss: The Stories and Recipes from Mia Famiglia."  Masters has offered no specific discussion of the need to enjoin the book.  Without a specific showing to the contrary, the court finds that the First Amendment concerns expressed in *Rogers* and *Mattel* mitigate against enjoining Mr. Valastro's choice of title.

Finally, the court considers what bond Masters' must post to satisfy the requirement that a party obtaining a preliminary injunction give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(b).  The court has "wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  In setting bond, the court must consider evidence of the "potential financial ramifications of entering a preliminary injunction."  *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999).  In this case, the court has insufficient evidence to consider the financial ramifications of the injunction it imposes on Discovery.  Discovery requested a $10 million dollar bond, but appears to have selected this number arbitrarily.  It provides only

ORDER – 22

1   the vaguest evidence of the costs of complying with an injunction, and no evidence

2   whatsoever of what amount of that cost would be unrecoverable in the event the

3   injunction were found to have been wrongfully entered.  The millions of dollars that

4   Discovery has already invested in *Cake Boss* is not a sunk cost.  The injunction does not

5   prevent the show from airing, it merely requires it to be renamed after the conclusion of

6   the current schedule.  There is no doubt a cost to renaming the program, but the court has

7   no competent evidence to assess that cost.

8         The court therefore sets bond at $10,000.  The court notes that the provisions of

9   the injunction that are effective immediately upon posting of bond should be expected to

10   have only a modest financial impact on Discovery.  The greatest expense will come in

11   retitling and promoting the retitled television program, which will not occur for some

12   time.  In the interim, Discovery may seek modification of this injunction should it decide

13   to offer evidence of the cost of retitling the program.

14   ### V.  MOTION TO SEAL

15         The court DENIES Defendants' motion to seal (Dkt. # 26), although the clerk

16   shall leave the documents that are the subject of that motion under seal: Discovery's

17   unredacted opposition to the preliminary injunction motion (Dkt. # 27), and the

18   declaration of Edward Sabin (Dkt. # 28).  Within 14 days of this order, Defendants shall

19   file a version of their opposition brief that redacts only the specific ratings numbers for

20   *Cake Boss* and the precise amount of its investment in the show.  General references to

21   the show costing "millions of dollars" and the request for a ten million dollar bond shall

22   not be redacted.  Mr. Sabin's declaration shall be refiled in two documents: one

23   consisting of the bulk of his current declaration, which contains no confidential

24   information at all; the other consisting of only specific ratings numbers for *Cake Boss* and

25   the precise amount of Discovery's investment in the show.  The court denies the motion

26   for the reasons stated in *supra* n.1, and because it finds no reason to hide Discovery's

27   request for a $10 million bond from public view.

28   ORDER – 23

## VI.   CONCLUSION

For the reasons previously stated, the court GRANTS Plaintiff's motion for a preliminary injunction (Dkt. # 6) and imposes the injunction set forth above.  The court DENIES Defendants' motion to seal (Dkt. # 26).

DATED this 16th day of July, 2010.

_Richard A. Jones_
The Honorable Richard A. Jones
United States District Judge

ORDER – 24